## TOWLE v. AMERICAN BLDG., LOAN & INV. SOC.

(Circuit Court, N. D. Illinois. February 6, 1894.)

1. EQUITY JURISDICTION—RECEIVERS—CORPORATIONS.
   Courts of equity have jurisdiction to appoint receivers to administer the assets of insolvent corporations.

2. BUILDING AND LOAN ASSOCIATION—RECEIVER—RIGHTS OF SHAREHOLDER.
   A shareholder in a building and loan association, whose officers have so mismanaged its affairs that its assets amount to less than two-thirds of the capital paid in, is entitled to have the corporate assets placed in the hands of a receiver.

3. JURISDICTION—AMOUNT IN CONTROVERSY—CORPORATIONS.
   In a suit by a shareholder for the appointment of a receiver of a corporation the amount in controversy is the value of the entire corporate assets.

4. SAME—DIVERSE CITIZENSHIP—COLLUSION—CORPORATIONS.
   A suit by a stockholder for the appointment of a receiver for the corporation will not be dismissed on the ground that the parties to the suit have been collusively arranged for the purpose of creating a case cognizable in the federal courts, where it appears that the assets of the corporation are in different states, and that its shareholders reside in different states, since in such case it is desirable to have all the corporate affairs wound up, under a homogeneous management.

In Equity. Suit by Marcus M. Towle against the American Building, Loan & Investment Society. A receiver having been appointed by the court, a petition has been filed by a receiver afterwards appointed by a state court, asking that this court's receiver be required to surrender to him the assets of the corporation. Denied.

Jesse A. Baldwin, for complainant.
Collins, Goodrich, Darrow & Vincent, for defendant.
Moran, Kraus, Mayer & Stein, for former receiver.
C. H. Aldrich, for present receiver.

GROSSCUP, District Judge. The original bill in this case discloses that the American Building, Loan & Investment Society was a corporation organized under the building and homestead acts of Illinois, with a capital stock of $50,000,000, divided into 500,000 shares of $100 each, of which 70,000 shares had already been issued to upwards of 7,000 shareholders; that upwards of $800,000 had been paid into the treasury of the society by the shareholders, of which $54,000 was deposited with the state officials of Massachusetts, and the balance has been loaned out on real-estate securities throughout the United States, about $300,000 of these loans being made on real estate in Illinois, and the remainder in Minnesota, Indiana, Ohio, Massachusetts, and other states; that for some reason the value of its assets is not to exceed $600,000, and its liabilitites to the stockholders amount to about $900,000; that more than 1,700 stockholders have already demanded the withdrawal value of their shares, amounting to nearly $200,000; and that attachment suits against the assets of the company have been begun in Indiana, and others are threatened in New Hampshire, Ohio, Kentucky, and Indiana. The bill is brought by a share-

holder of the company, residing in Indiana, on behalf of himself and all other shareholders joining him, and its object is to surrender to the court the administration of the remaining assets of the corporation. The answer of the society, filed with the bill, admits all the allegations therein set forth, and consents to a surrender of the assets to the administration of the court. On the presentation of this bill and answer, a receiver was, on the 1st of January, 1894, appointed by this court, who has since taken the assets of the corporation into his keeping.

On the 15th day of January following, the circuit court of Cook county, on the motion of the attorney general of Illinois, appointed another receiver for the assets of the same company, under section 17 of the act of June 19, 1893, amending sections 3, 15, 16, and 17 of the building and loan society act. The information under which this receiver was appointed is directed to the winding up of the affairs of the society, and charges that the insolvency of the society is due to the intentional and dishonest mismanagement of its officers; that the officers of the society have substantially abstracted large amounts of its assets, through pretended loans to nominal borrowers upon pretended real-estate securities. Many specific instances of these transactions are set up in the information, and, if true, reveal a conspiracy upon the part of the officers to loot the treasury of the society. The receiver of the state court now asks leave to file his petition in this court, asking that the receiver appointed here should be ordered to surrender to him the assets of the corporation, and bases his motion upon the facts disclosed by the pleadings in this cause and in the state court.

It is urged that this court had no jurisdiction to appoint the receiver—First, because the case made out by the bill and answer does not, within the rules of equitable jurisprudence as recognized and enforced in the federal courts, justify the appointment of a receiver; second, because the requisite elements to confer jurisdiction upon the federal courts are not disclosed. I have no doubt that courts of equity have the ultimate power of administering the assets of insolvent corporations. Whether a case is made out for the exercise of that power, or the parties before the court are in a position to invoke it, is altogether another question. The supreme court has, in a number of cases, recognized the existence of such a power while pointing out the care with which it should be put into exercise. Sage v. Railroad Co., 125 U. S. 361, 8 Sup. Ct. 887; Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787; Hollins v. Brierfield Coal & Iron Co., 14 Sup. Ct. 127. The last case above cited was that of an unsecured creditor against the corporation, suing on behalf of himself and all other creditors, and asking, in effect, that the assets of the insolvent corporation be brought into court, to be distributed among the creditors, as their interest might appear. Speaking for the court, Mr. Justice Brewer says:

"It cannot be doubted that the final decree, providing for a settlement of the affairs of the corporation and distribution among creditors, could not have been challenged on the ground of a want of jurisdiction in this court, and that notwithstanding it appeared upon the face of the bill that plaintiffs

were simple contract creditors, because the administration of the assets of an insolvent corporation is within the functions of a court of equity, and, the parties being before the court, it has power to proceed with such administration."

The relief was denied to the complainants in that case, not because of the want of power in the court, but because the creditor, not having reduced his claim to judgment, was in no position to invoke that power, or set it in motion.

Should the power be exercised in favor of the complainant herein? The case is a peculiar one. The complainant is, substantially, both depositor and shareholder. Under the constitution of the society, each member passed into the treasury, periodically, certain stipulated sums. The fund thus collected is loaned out upon real-estate security. The interest of the member is not that simply of a depositor in a bank, or a creditor of a corporation. He holds no promise of the corporation for a return of his fund. He is a part owner of the fund,—has an interest directly in the fund,— and is entitled to a proportionate share, as owner, upon its distribution. The whole scheme of building associations is that of a corporate copartnership, whereby are gathered into a common fund, and loaned as such, the money of many individuals. The interest of each shareholder in the sums thus collected and loaned is as direct as if no corporation intervened. The corporation has no function or power, except to loan out these gathered sums, and return the avails thereof into the hands of the contributors. If the stockholder of a corporation or a partner in copartnership can rightfully invoke the aid of equity to administer the assets of the corporation or copartnership, when such power seems essential to the conservation of the assets, I can see no reason why the complainant is not entitled to a like aid.

That the relief will be afforded to stockholders and copartners upon a proper showing is not seriously denied. The need of such relief in this case seems to me to be imperative. The information of the attorney general in another court of equity is one of its most striking evidences. The society, I think, largely through the mismanagement of its officers, has so impaired the assets that there appears to be on hand less than 66 per cent. upon a dollar contributed. There is no claim that this loss is merely temporary, or that the continuance of the society in its present management will repair the evil. A continuance of the organization would simply be a hardship upon already injured shareholders, and nothing in their interest can be suggested except a speedy and intelligent collection of the assets for redistribution among the members. This, manifestly, ought not to be done by the management that has brought about the injury, and there is no way pointed out for the substitution of a new management that will promise a better administration. Here, then, is $900,000 collected from innumerable sources. Most of the contributors are among the poor, people not accustomed to the management of business affairs. This large fund is scattered through five or six states, and already promises a return of less than 66 per cent. of the original

advance. There is no management in power except the discred-ited and distrusted officers. Upon what pretext can a court of equity close its ears against the call to take hold?

It is urged, however, that the federal court has no jurisdiction, because there is no controversy between the complainant and the defendant, and, if there were, it is not shown that it exceeds $2,000 in amount. It is sufficient to say that whenever any property or claim of parties capable of a pecuniary estimation is the subject of litigation, a controversy, within the meaning of the judiciary act, is disclosed. In this case the entire assets of the society are brought into court for administration, and are, therefore, the matters in dispute or controversy.

A much more serious objection, however, is the one that the parties to the suit have been collusively arranged for the purpose of creating a case cognizable in the federal courts. It cannot be seriously disputed that, in the absence of collusion, a stockholder has a right to bring his action against the corporation in the federal courts, provided diverse citizenship exists, and the case is one in which the stockholder is entitled to an action at all. There are abundance of cases upholding, and none opposed to, this proposition. Hawes v. Oakland, 104 U. S. 450, urged with some emphasis by counsel for the petitioner, turned upon the finding of the court that the stockholder, on the facts there disclosed, had no right of action in any court against the corporation. The care with which the court points this out, and enforces it with a collection of authorities, shows that there was no intention of foreclosing a stockholder from the federal courts in cases where he had a right to complain of the corporation, and the requisite diverse citizenship existed.

It is apparent, however, that this interpretation opens a wide door to abuse. It is a matter of no difficulty to place stock in the hands of a citizen of some state other than that of the corporation, and thus create the element of diverse citizenship. Under this arrangement, every controversy in which a stockholder has a right to complain of the conduct of the corporation could be brought within the jurisdiction of the federal courts. So apparent already had the abuse become that congress inserted in the act of March 3, 1875, the provision that if, at any time in the progress of the case, either originally commenced in the circuit court or removed there from the state court, it should appear that the suit did not really and substantially involve a dispute or controversy properly within the jurisdiction of the federal court, or that the parties to the suit had been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable to the federal court, the court should proceed no further, but dismiss the suit peremptorily, or remand it to the state court.

I conceive it to be the duty of the federal courts to examine each case carefully to ascertain if it falls within the terms of this provision. The jurisdiction of the state courts, and the application of state polity, ought not to be taken away, except in those cases which fall within the spirit of the judiciary act. The system of

federal courts is not intended to supersede the state courts, but only to furnish a tribunal where the substantial rights of citizens of different states may be determined.    To extend this jurisdiction further, so as to take in the controversies which are practically between the citizens of the same state, is to erect tribunals not contemplated, either by the constitution of the United States or of the state, and contrary to the spirit of both.    The fact of diverse citizenship of complainant and defendant, in such a case as this, is not, therefore, in my opinion, standing alone, a sufficient warranty to hold jurisdiction.    In the absence of any good reason for bringing the action into the federal courts, I would be disposed to hold that the arrangement of the parties was collusive for jurisdictional purposes. The question, then, arises, is there any substantial reason why the shareholder, seeking an administration of these assets, should select the federal courts?    And, if so, was it the reason that dominated the bringing of this action therein?    The pleadings disclose that the entire assets of this company, except $300,000, are represented by mortgages on real estate situated in states other than Illinois, and that many shareholders of the company reside in these sister states.    What effect will these facts have upon a closing up of the affairs of the corporation at once equitable, economic, and speedy?    Under the federal procedure, the receiver appointed in this court is, by a system of ancillary proceedings, likewise appointed receiver in the several circuits in which this property is situated.    The administration of the assets is thus centralized, —the ancillary is but a part of the home receivership.    There is but one administration, one distribution.    Each shareholder, whether he live in Illinois or Massachusetts, will receive his exact proportionate amount, as if he were a citizen of the same state. For the purposes of the suit, there is but one jurisdiction, one administration, one distribution, and one incidental expenditure.    It is obvious that no quicker, cheaper, or more equitable administration could be had.

Will the same results attend an administration of these assets through the state courts?    The laws of all the states to which my attention has been called require that receivers shall be residents thereof.    There will therefore be as many receivers as there are states. .   Each receivership will be the result and concomitant of an independent suit.    There will therefore be as many suits, with their attendant expenses, as there are states.    Each suit is entirely independent of the other, and will be determined according to interpretation of the law adopted by that particular court.    Will all these courts hold that the shareholder is not a creditor entitled to a prior lien by attachment upon the property within their several jurisdictions?    Will they discriminate against the home claimant, and send the fund realized to a common center, to be distributed?    Which court will be regarded as the home receivership, and entitled to the right of distribution?    Might it not turn out that in states where the number of members were few and the assets large each member would be reimbursed in full for his advance, while in states where the membership was large, and the

assets proportionally smaller, each member would receive much less than his proper ratio of the assets?   Or, if it be assumed that the several state courts would disregard the apparent interests of the home claimants, and turn in the funds to a common officer, to be distributed, would there not probably rise, in the foreclosure proceedings, numerous lines of litigation going to many different tribunals of last resort, and thereby subjecting the fund to larger expenses and greater uncertainty?   The advantages of a homogeneous administration of these assets, scattered, as they are, throughout so many states, are at once so obvious and imperative that it seems to me that no inference that the federal court was selected by collusion can be raised.

For the foregoing reasons I deem it my duty to hold jurisdiction of this case and of the receivership to which it has given rise.   But none of the reasons impelling me to this conclusion favor the retention of the present receiver.   The building associations of Illinois have become institutions of great magnitude and consequence. They are, practically, savings institutions, and invite the deposit of large numbers of people whose frugality enables, and whose forethought impels, them to lay by a store for the future.   These are, at once, among the most deserving of our citizens, and the least skilled in ascertaining a safe depository for their savings.   Seventy million dollars have thus already been gathered into the hands of these societies.   I know of no institutions, except perhaps savings banks, that have a greater title to be regarded as quasi public institutions.   I know of no institutions that ought to be regulated and inspected with greater care, and subjected to more rigid scrutiny, than these treasuries of the poor.   The officers of these institutions carry a great trust, and ought, when derelict,—especially when intentionally derelict,—to be subjected to instant and severe punishment.   The state ought to watch them with a vigilant eye, to see that cupidity or treachery do not succeed, or, if they do succeed, are speedily corrected.   I regard the recent legislation in this state as a beneficent step in that direction.   The auditor of public accounts and the attorney general are thereby created public agents to see that no harm or wrong creeps into these institutions of the people, and to seize and close them up the moment that any malfeasance appears.   It would be intolerable to throw any obstacle in the way of these officers of the public, or to deprive them of a potent voice in the selection of the agents intended to carry out these purposes.   There is not one, but many, of these societies whose affairs have become honeycombed with maladministration.   I can conceive that a systematic and harmonious execution of the whole trust, which all of these societies, taken together, throw upon the officers of the state, might require identity of receiverships.   If the attorney general will intervene in this suit, and suggest a name for the receivership whose qualifications meet with the approval of the court, I will substitute him for the present receiver.